**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SARA LESENDE AND VICTOR LESENDE, her husband, | |
| Plaintiff, | |
| v. | Civ. No.  06-4967 (DRD) |
| POLICE OFFICER ARNOLD BORRERO, et. al., | **O P I N I O N** |
| Defendants. | |

*Appearances by:*

Nusbaum, Stein, Goldstein, Bronstein & Kron
by:  Robert D. Kobin, Esq.
20 Commerce Boulevard
Suite E
Succasunna, NJ 07876

> *Attorney for Plaintiffs,*

City of Newark, Corporation Counsel
by:  Avion Monique Benjamin, Esq.
920 Broad Street
Room 316
Newark, NJ 07102

> *Attorney for Defendants.*

**DEBEVOISE, Senior District Judge**

On December 18, 2004, Arnold Borrero, then a police officer in the Newark Police

Department, stopped the Plaintiff, Sara Lesende, while she was driving her car, assaulted her in

her car, and arrested her.   The Complaint alleges against Borrero, the City of Newark ("City"),

and a number of police officers, fifteen state tort and state and federal constitutional claims.

Although the present motion was filed by a group of defendants, including the City of Newark, Lieutenant Crystal Burroughs, Sergeant Lilliam Carpenter, and Captain Albert A. Cicalese, the parties agreed at oral argument that all the officer defendants, with the exception of Borrero, would be dismissed from the case.  Therefore, the present motion for summary judgment, pursuant to Fed. R. Civ. P. 56, pertains only to the claims against the City of Newark ("City").  The City seeks summary judgment on all claims.  Lesende argues that the City should be liable for Borrero's actions.  The City's motion will be granted in part and denied in part.  The Court will grant summary judgment to the City on Counts One, Two, Three, Four, Five, Seven, Eight, Nine, Ten, Eleven, Twelve, Thirteen, and Fourteen and on the issue of pain and suffering damages for the state law claims, but deny the City's summary judgment request for Counts Six and Fifteen.

## I.  BACKGROUND

The altercation between Lesende and Borrero occurred on October 18, 2004.  Lesende filed the Complaint with this Court on October 17, 2006.  The City, Burroughs, Carpenter, and Cicalese filed answers to the Complaint.  Borrero filed a separate Answer that asserted two counterclaims against Lesende, for:  (1) assault and battery, alleging that Lesende had in fact attacked Borrero while he waited for back-up; and (2) negligence in causing her fingernails to come into contact with Borrero's body.  According to orders from Magistrate Judge Shipp, discovery was due on March 6, 2009 and dispositive motions were due by October 12, 2009.  The City, along with Burroughs, Carpenter, and Cicalese filed the present motion on October 8,

2009. [1]  The Court held oral arguments on the motion on January 19, 2010.  During oral arguments, the counsel for Plaintiffs assented to the dismissal of all the claims against all the officer defendants (with the exception of Borrero), including Anthony F. Ambrose, Irving Bradley, Burroughs, Carpenter, Cicalese, and Captain Richard Cuccuolo.  The Newark Police Department is a named defendant, but under New Jersey law a municipal police department is not an entity separate from the municipality.  See N.J. Stat. Ann. § 40A:14-118.  Accordingly, the Newark Police Department is not a proper defendant in this action.  See Adams v. City of Camden, 461 F. Supp. 2d 263, 265 (D.N.J. 2006).  Borrero is represented by separate counsel and did not join in the present motion.  Therefore, the present motion only covers Lesende's claims against the City.

Generally, Lesende premises the City's liability on its alleged policy or custom of condoning Borrero's actions, or the alleged failure of its training, supervision, policies, procedures, or directives with regard to Borrero.   The Complaint alleges against all defendants, (except where noted otherwise), claims for:  (1) false arrest and/or false imprisonment; (2) malicious prosecution for charging Lesende with aggravated assault and resisting arrest; (3) intentional infliction of emotional distress; (4) malicious abuse of process; (5) tortious interference with economic advantage; (6) negligent training and supervision, against the City and the named officers other than Borrero; (7) civil conspiracy to commit the torts and civil rights violations alleged in the Complaint; (8) liability under the New Jersey Civil Rights Act, N.J. Stat. Ann. § 10:6-2, based on infringement of the exercise and enjoyment of Lesende's

---

[1] At oral argument, Counsel for the City stated that she had not filed motions for summary judgment on behalf of the other officers because they had not been properly served or had not requested representation from the City's Corporation Counsel.

substantive due process and equal protection rights, and the privileges and immunities secured by laws or constitutions of the United States and New Jersey; (9) liability under 42 U.S.C. § 1983, for violations of Lesende's Fourth and Fourteenth Amendment rights; (10) liability under 42 U.S.C. § 1985 for conspiracy to deprive Lesende of the equal protection of the law; (11) use of excessive force, in violation of N.J. Stat. Ann. § 2C:3-7; (12) liability under § 1983 for alleged violations of the Fourth and Fourteenth Amendments, based on the Rules Governing the Courts of the State of New Jersey, 3:3-1 and 3:4-1, for the manner in which the warrant for Lesende's arrest was issued; (13) malicious assault and battery; (14) assault and battery; and (15) a claim by Victor Lesende, Sara Lesende's husband, for loss of consortium as a result of the defendants' violations.  Lesende seeks compensatory and punitive damages, interest, attorneys' fees, and costs.

Lesende is of Peruvian descent.  She is married to the co-plaintiff, Victor Lesende, and the couple has one child.  She earned a master's degree in electrical engineering from the New Jersey Institute of Technology and a master's certificate in project management from George Washington University.  She currently works as a network engineer for Verizon.

Around 8:20 a.m. on October 18, 2004, Lesende left the gym to go to her home on Elm Street in Newark, New Jersey.  She was circling the block in search of a place to park when she noticed a blue van behind her honking its horn.  (Pl. Resp. to Def.'s Interrog. # 8.)  She continued to drive and found a parking space at the intersection of Elm and Jefferson Street. (Id.)  When she slowed down to turn into the parking space, the blue van, which had been following her, pulled up and stopped perpendicularly in front of her car, cutting off her path. (Id.)  Borrero exited the blue van and began yelling profanities and insults at Lesende.  (Id.) While yelling profanities at Lesende, like "stupid bitch" and "motherfucker," Borrero unzipped

4

his jacket and produced his badge.  (<u>Id.</u>)  Borrero went to his vehicle to call another officer.  He

told the officer that he was having an argument with a woman.  (Lesende Dep. 14:11-15, May

22, 2008.)

Lesende reached for her car keys to turn off the ignition and Borrero punched her on the

left side of her face.  (<u>Id.</u> 14:22-24.)  The punch knocked her down, and she lay with part of her

body in the passenger seat, in a prone position.  (<u>Id.</u> 14:24-25.)  He opened her car door and,

climbing on top of her body, he pulled her hair, called her names, hit her, scratched her arm and

her neck, and punched her on her left side.  (<u>Id.</u> 14:25-15:6-20.)  Borrero pointed his gun at two

bystanders who observed the incident.  Borrero cursed at one of them and told him not to

interfere.  (<u>Id.</u> 15:21-16:4.)  He pointed his gun at Lesende next, and she begged him not to shoot

her.  (<u>Id.</u> 16:4-17.)  Five police cars pulled up and one of the arriving officers pointed his gun at

Lesende, threatened to shoot her, and then arrested her and locked her in a police car.  (<u>Id.</u>

16:19.)  Borrero and another officer searched and kicked her car.  (<u>Id.</u> 16:21-23.)

The officers impounded Lesende's vehicle.  (<u>Id.</u> 17:16.)  En route to the police station,

the officer driving Lesende stopped the car to talk to a friend and laughed for 20 minutes while

she was in the car crying desperately for help.  (<u>Id.</u> 17:18-24.)  When they arrived at the station,

Lesende asked to speak with a superior officer.  (<u>Id.</u> 24:9-14.)  They put her in a cell, and an hour

later, a superior officer came to speak with her.  (<u>Id.</u> 24:17-18.)  She asked him to keep Borrero

away from her.  (<u>Id.</u> 24:21-25:7.)  Borrero came to take Lesende to make a phone call.  (<u>Id.</u> 25:7-

8.)  Borrero pulled her shirt and pushed her while he took her to the phone.  (<u>Id.</u> 25:9-11.)  He

made fun of her accent.  (Pl. Resp. to Def.'s Interrog. # 8.)  When he took her back to the cell, he

handcuffed her to a chair and called her names.  (Lesende Dep. 25:12-20.)  She spent 12 hours in

jail.  (Pl. Resp. to Def.'s Interrog. # 11.)  On October 19, 2004, a complaint warrant was filed

against the Plaintiff.  Borrero and a sergeant signed the warrant, which stated that Lesende had committed

> [A]ggravated assault on a police officer A. BORRERO while was [sic] displaying his uniform and badge, specifically by slapping and scratching the officers [sic] face and left hand, in violation of N.J.S. 2C:12-1.b.

> Within the jurisdiction of this court commit an act of resisting arrest by a police officer after she was advised that she was under lawful arrest in violation of N.J.S. 2C:29-2.b.

The Superior Court eventually dismissed the claims for lack of prosecution and speedy trial violations.

During the entire altercation, Lesende was scared, confused, and weeping.  She suffered scratches on the left side of her neck and on the left side of her ribs, a split lip, bruises on her left arm, face, and neck, and low and mid-back pain.  (Pl. Resp. to Def.'s Interrog. # 5.)  Part of the braces on her teeth came off.  The cut on the left side of her ribs left a scar.  Since the incident, Lesende suffered and continues to suffer from trauma, nightmares, fear of going outside, fear of police officers, and anxiety.  Marion Hecht, a counselor from whom Lesende received treatment, diagnosed Lesende with post traumatic stress disorder, based on her symptoms of flashbacks, nightmares, triggers which bring on her symptoms, and emotional and behavioral avoidance.  (Id.; Hecht Letter, October 30, 2006.)  Overall, the incident caused Lesende a great deal of stress and worry.  (Pl. Resp. to Def.'s Interrog . # 5.)  She feels that the assault changed her social skills, her personality, her attitude, her temper, and her relationships with her husband and friends.  (Lesende Dep. 39:11-14.)

Due to an inability to concentrate after the incident, Lesende missed an opportunity to take the Graduate Management Admission Test, which she had scheduled for November 2004.  Additionally, she had trouble concentrating and felt stressed at work.  She had difficulty keeping

up with projects so she left her job at IBM in 2004, shortly after the incident.  (Id. 39:11-40:19.)
She eventually began a new job at Verizon in January 2005.

In connection with this litigation, Lesende hired Wayne S. Fisher, Ph.D., to provide his
professional opinion on New Jersey police policy regarding the propriety of Borrero's use of
force as an off-duty police officer; the integrity of the City's investigation of Lesende's internal
affairs complaint; and the propriety of the disciplinary actions the City took against Borrero,
based on his disciplinary history and other factors.  Fisher is the Director of the Policy Institute at
the Rutgers University Law and Justice Center in Newark and has been a member of the adjunct
faculty at the Rutgers Graduate School of Criminal Justice for 25 years.  Additionally, since
2003, Fisher has acted as a consultant to state, county, and municipal law enforcement agencies,
concerning organizational and operational issues.  He has served as an expert witness on behalf
of county and municipal government units and private parties in civil and criminal litigation
involving a broad range of police and law enforcement-related issues.  Fisher served as a law
enforcement officer and detective with the Newark Police Department for nine years.  From
1987 to 2003, he served as an appointed Deputy Director of the New Jersey Attorney ("AG")
General's Division of Criminal Justice.  In that capacity, he exercised general leadership and
supervisory responsibilities regarding local police on behalf of the AG.  Additionally, he was
responsible for developing operational standards and directives for police agencies in areas such
as the use of force, vehicular pursuit, internal affairs, and drug testing.  Fisher also served as the
Chairman of the New Jersey Police Training Commission, directing staff responsible for the
development of the statewide police training curriculum and for oversight of the State's 23
certified police academies.  That position involved a number of experiences pertinent to the
present matter, including service:  (1) as the directing author of the statewide Internal Affairs

7

Policy and Procedures, issued by the AG in 1991, 1992, and 2000; (2) as an instructor in

numerous training sessions regarding statewide internal affairs policy for internal affairs officers;

(3) as the Chairman of the AG's Task Force on the Use of Force in Law Enforcement, which

issued the Attorney General's Use of Force Policy in 2000; and (4) as an instructor in training

sessions conducted in all 21 counties to prepare police trainers to train other officers in the

provisions on the use of force policy.  (Fisher Report at 1-2.)

  In preparing his reports in the present matter, Fisher reviewed relevant police reports,

police department records, court documents, and deposition transcripts.  Borrero's disciplinary

record lists a total of 45 internal affairs cases resulting in the imposition of 15 penalties.  In three

separate matters, three Administrative Law Judges found that Borrero was not credible or made

false statements.  (Fisher Supp. Report at 4.)  Cuccolo acknowledged that Borrero had an

"extensive" disciplinary record.  (Cuccolo Dep. 111:19-112:3, June 26, 2008.)  Borrero's record

includes four excessive force allegations (none of which were sustained), a sustained false

reporting complaint, and a sustained allegation of assisting an out-of-state bounty hunter's search

for a fugitive in New Jersey.  Borrero was suspended for 20 days for an act of disrespect or

insubordination and the filing of a false report and assault complaint (Id. 91:1-15.)  Additionally,

three demeanor complaints, two of which were sustained, were lodged against Borrero for an

incident that took place at Penn Station during a 20-day period and involved motorists who

questioned Borrero while being cited for parking violations.  Fisher opines that the common

provoking circumstance in each of the three complaints, which involved minor traffic violations,

was a citizen's questioning of Borrero's exercise of authority.  (Fisher Report at 19.)

  The City issued an order for Borrero's psychological evaluation on September 28, 2004,

in response to, yet nine months after the Penn Station demeanor allegations.  Fisher opined that

the City could have ordered an evaluation earlier, or in the alternative, could have assigned

Borrero to administrative duty while the evaluation was pending.  (Id.)  Additionally, Fisher

believes that the progression of penalties imposed on Office Borrero was consistent with the

AG's principles of progressive discipline.  (Id. at 18.)  Fisher opined that on a case-by-case basis,

the investigations and dispositions of complaints against Borrero were undertaken in a manner

consistent with applicable statutes, regulations, and policies.  However, Fisher believes that the

City should have taken Borrero's entire disciplinary history into account when reviewing each

subsequent individual allegation.  (Id. at 20.)  With regard to the propriety of the City's

continued retention of Borrero as an employee, Fisher opined that:

> [B]ased on Officer Borrero's entire disciplinary history the Newark Police
> Department should have taken steps to terminate him prior to the October, 2004
> arrest of the plaintiff.  Officer Borrero's pattern of conduct could have been and
> should have been viewed in a context broader than the facts attending each
> complaint as it came along.  Based on the prevailing professional standards…a
> review of Officer Borrero's conduct and disciplinary history, in its entirety,
> should have resulted in the Newark Police Department initiating action to
> terminate the officer well in advance of the date of plaintiff's arrest.

(Fisher Supp. Report at 5-6.)  Further, Fisher stated that "[i]t is clear...that despite progressive

discipline being imposed, the frequency of complaints against Officer Borrero was increasing

over time."  (Fisher Report at 18.)

Additionally, Fisher furnished an opinion regarding the internal affairs investigation

instituted in response to Lesende's complaints.  Fisher noted that New Jersey law requires police

departments to conduct their internal affairs functions in a manner consistent with the Internal

Affairs Policy and Procedures ("IA Policy") issued by the New Jersey Attorney General.  Based

on a review of the City's internal investigation file, Fisher opined that "the immediate response

of Internal Affairs personnel at the time of the plaintiff's complaint, the immediate canvassing

9

for witnesses and the subsequent investigative efforts and documentation" were consistent with the standards set in the statewide policy.  (Fisher Report at 12.)  However, Fisher believes that the investigation was inappropriately limited in scope, in two manners.  First, based on the AG's IA Policy, in the context of an allegation of excessive force during an arrest, an investigation should examine "whether the officer should have been affecting the arrest at all."  (Id. at 13.) Second, the investigation "should have examined whether Officer Borrero's use of constructive force (i.e. pointing his firearm at other persons present at the time of the plaintiff's arrest) was consistent with applicable state and agency policy regarding the use of force."  Further, Fisher believes that the failure to assess Borrero's use of constructive force during the incident with Lesende "should have been noted by the executive and command officer reviewing and concurring with the dispositions recommended by the case investigator."  (Id. at 16.)

With regard to the City's training of officers for involvement in law enforcement-related activities while off-duty, Fisher offered two opinions.  First, he noted that the Police Training Commission requires that an officer's employing agency be responsible for certifying her familiarity with policies and procedures regarding standards of conduct while on and off duty. (Fisher Report at 12.)  Next, Fisher opined that the City should, but does not appear to have had:

> [A] Department Policy Directive or General Order regarding the off-duty exercise of law enforcement authority.  That policy or order should serve as the basis for compliance with Police Training Commission requirements, it should be disseminated to all officers, and it should be included in the department's ongoing program of in-service training.

(Fisher Supp. Report at 3.)   Additionally, Fisher described the state-mandated training curriculum for police officers regarding off-duty interactions with the public.  The training curriculum teaches that when an off-duty officer witnesses a motor vehicle violation, she should not take immediate action unless the violation constitutes a threat to public safety.  (Fisher

Report at 10.)  Fisher noted that Borrero's off-duty actions with regard to Lesende failed to comport with police officer training directives and generally accepted standards of practice in the police profession.  Id. at 11.

## II.    DISCUSSION

The City contends that Lesende cannot recover damages for pain and suffering for the state law tort claims, since she did not suffer a permanent disfigurement or dismemberment for which the medical treatment expenses exceeded $3,600.  Additionally, the City argues that even taking the facts in the light most favorable to Lesende, she has not established the elements of her claim for Count Two, malicious prosecution, Count Three, intentional infliction of emotional distress, or Count Ten, a § 1983 conspiracy claim against the City.  The City argues that Lesende has failed to show that a policy or custom of the municipal entity caused the constitutional deprivation of rights of which Lesende complains, or that any municipal practice was the proximate cause of the injuries Lesende suffered.

Lesende counters that the Court should deny the City's motion for summary judgment on the issue of pain and suffering damages for her state tort law claims, since post traumatic stress disorder is a permanent condition and a jury should decide whether her injury meets the statutory threshold.  Lesende argues that the City should be vicariously liable on Count Two for malicious prosecution because the complaint warrant against Lesende, for which no probable cause existed, was authorized by a Sergeant.  Lesende argues, based on Fisher's testimony, that the City should be liable on the § 1983 and negligent supervision claims, Counts Six and Nine, because it complied only superficially with the Attorney General Guidelines and its own policies and procedures, allowed a complaint warrant to issue for Lesende, and failed to adequately address Borrero's continued violations in light of his extensive disciplinary record.  The City has

11

demonstrated that there is no genuine issue of fact as to Counts One, Two, Three, Four, Five, Seven, Eight, Nine, Ten, Eleven, Twelve, Thirteen, and Fourteen, such that those claims should be dismissed at this stage.

**A.      Standard of Review**

Summary judgment is proper where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006).  For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

In a motion for summary judgment, the moving party has the burden of showing that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party does not bear the burden of proof at trial, the moving party may discharge its burden by showing that there is an absence of evidence to support the non-moving party's case. Id. at 325.  If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine issue of fact exists and a trial is necessary. Id. at 324.  In meeting its burden, the non-moving party must offer specific facts that establish a genuine issue of material fact, not just create "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party. See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).  The Court's function, however, is not to

weigh the evidence and determine the truth of the matter, but, rather, to determine whether there

is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  If there

are no issues that require a trial, then judgment as a matter of law is appropriate.

**B.      New Jersey Tort Claims Act**

The City raises two issues with regard to the New Jersey Tort Claims Act ("TCA") in

support of its motion for summary judgment:  (1) the N.J. Stat. Ann. § 59:9-2(d) threshold

regarding pain and suffering damages for state law claims, and (2) public entity liability for acts

of public employees that constitute willful misconduct.

### i.      *The N.J. Stat. Ann. § 59:9-2(d) Threshold*

The City argues that the verbal threshold of the TCA, N.J. Stat. Ann. § 59:9-2(d),[2] bars

Lesende's state law tort claims.  Lesende counters that the City's interpretation of the verbal

threshold is overbroad.  Lesende is correct.  The verbal threshold bars damages for pain and

suffering under certain circumstances, rather than barring the entire claim.  Thus, even if the

Lesende's claims do not meet the threshold requirement, she is not prevented from seeking

reimbursement for full net economic loss.  Rocco v. New Jersey Transit Rail Operations, 330

N.J. Super. 320, 334 (App. Div. 2000).  However, here, Lesende alleges that the injuries she

suffered as a result of the altercation with Borrero do amount to a permanent loss of bodily

function sufficient to vault the threshold.  Although the Court finds that Lesende has shown that

---

[2] N.J. Stat. Ann. 59:9-2(d) states:  No damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided, however, that this limitation on the recovery of damages for pain and suffering shall not apply in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $ 3,600.00. For purposes of this section medical treatment expenses are defined as the reasonable value of services rendered for necessary surgical, medical and dental treatment of the claimant for such injury, sickness or disease, including prosthetic devices and ambulance, hospital or professional nursing service.

a genuine of fact exists as to whether she met certain elements of the threshold, she has failed to adduce evidence showing that the cost of treating her injuries exceeded $3,600, so she will not be allowed to recover pain and suffering damages against the City.

To recover damages for pain and suffering under the TCA, a plaintiff must prove "(1) an objective permanent injury, and (2) a permanent loss of a bodily function that is substantial." Gilhooley v. County of Union, 164 N.J. 533, 541, 753 A.2d 1137 (2000).  In sum, to defeat summary judgment on the issue of pain and suffering damages, Lesende must adduce evidence demonstrating that she has (1) suffered a loss of bodily function, disfigurement or dismemberment, (2) that is permanent, (3) substantial, and (4) for which medical treatment expenses are in excess of $3,600.

In Collins v. Union County Jail, 150 N.J. 407 (1997), the Supreme Court of New Jersey considered the question of whether the verbal threshold barred pain and suffering damages for a plaintiff who had been raped by a corrections officer while incarcerated and as a result suffered from post-traumatic stress disorder in the form of ongoing frequent nightmares, flashbacks, difficulty sleeping, sudden outbursts of crying, screaming in his sleep, a severe loss of self-esteem, and an inability to trust others.  The Supreme Court held that in circumstances like that of the Collins plaintiff's, where an aggravating and intrusive assault caused one to sustain a permanent psychological injury, a debilitating psychological order like post-traumatic stress disorder may constitute a "permanent loss of a bodily function" pursuant to N.J. Stat. Ann. § 59:9-2(d).  Id. at 423.  The Supreme Court stated that "psychological and emotional injuries should be treated the same as physical injuries under the Act's threshold provision when they arise in a context similar to that which precipitated plaintiff's injuries."  Id.

"[A] determination of whether a claimant has sustained injuries sufficient to satisfy the threshold under the Tort Claims Act is fact sensitive, and therefore, not conducive to per se rules." Kahrar v. Borough of Wallington, 171 N.J. 3, 15 (2002). A plaintiff must present "sufficiently aggravated" circumstances to prevail under a psychological claim. Gerber v. Springfield Bd. of Educ., 328 N.J. Super. 24, 37 (App. Div. 2000) (quoting Hammer v. Township of Livingston, 318 N.J. Super. 298, 307 (1999)). "A 'mild level' of anxiety or depression is not a sufficient impairment to constitute a 'substantial' loss of bodily function." Id.

The circumstances of the attack—a seemingly unprovoked assault by a police officer on a private citizen in broad daylight—are sufficiently aggravating and intrusive to allow Lesende to vault the threshold. During the altercation with Borrero, Lesende suffered scratches on the left side of her neck and on the left side of her ribs, which left a scar, a split lip, bruises on her left arm, face, and neck, and low and mid-back pain, and the braces came off of her teeth. Additionally, since the incident, Lesende suffered from trauma, nightmares, fear of going outside, fear of police officers, anxiety. She has been diagnosed with post-traumatic stress disorder, based on her symptoms of flashbacks, nightmares, triggers which bring on her symptoms, and emotional and behavioral avoidance. This evidence is sufficient under Collins to raise a genuine issue of fact at the summary judgment stage as to the factor of whether Lesende's injuries constitute a "permanent loss of a bodily function."

Hecht, Lesende's medical expert, has not offered the Court an opinion as to whether or not her symptoms are permanent. However, the a November 6, 2008 letter from Hecht confirms that as of that date Lesende continued to suffer from symptoms of post-traumatic stress disorder, including flashbacks, nightmares, triggers which bring on her symptoms, and emotional and behavioral avoidance caused by the altercation with Borrero. That letter provides evidence that

approximately four years after the incident, Lesende continued to suffer psychological injuries. That evidence of the longevity of Lesende's symptoms evidence at least raises an issue as to whether Lesende's injuries are permanent and substantial, such that a jury should be allowed to determine whether she meets the threshold.  See Willis v. Ashby, 353 N.J. Super. 104, 113 (App. Div. 2002) (explaining that where a factual dispute existed as to whether a plaintiff met the threshold, the question should be presented to a jury).

Thus, Lesende has adduced sufficient evidence to raise a question of fact as to three elements of the threshold—a loss of bodily function that is permanent and substantial.  However, Lesende did not create a material dispute as to all of the threshold elements, because Lesende has failed to provide the Court with any evidence that the cost of treating her injuries exceeded $3,600.  Lesende's opposition brief contains a list purporting to show that Lesende's medical expenses for her physical and psychological injuries totaled $6,695.70.  However, the list does not direct the Court to any admissible evidence.  Rather, the list of "bills" in the brief provides the only information relating to Lesende's medical expenses that the Court can find in the record. Arguments or assertions submitted in a brief do not constitute evidence, and at this stage in the litigation, Lesende cannot create a material dispute without offering evidence to support her assertions.  Therefore, the Court must grant Defendants' motion for summary judgment on the issue of the verbal threshold.  Because Lesende has not presented any evidence that the cost of treating her injuries exceeded $3,600, she will not be permitted to recover damages for pain and suffering against the City for her state law tort claims.

### ii.     N.J. Stat. Ann. § 59:2-10, Public Entity Liability for Acts of Willful Misconduct

A public entity "is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a

16

private individual under like circumstances." N.J. Stat. Ann. § 59:2-2(a). However, the TCA limits a public entity's vicarious liability by excluding it from liability for "acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct." N.J. Stat. Ann. § 59:2-10; Pomykacz v. Borough of W. Wildwood, 438 F. Supp. 2d 504, 517 (D.N.J. 2006). "Thus, there can be no vicarious liability by a public entity for intentional torts committed by its employees; that is, with respect to such intentional torts, the theory of respondeat superior does not apply." Hoag v. Brown, 397 N.J. Super. 34, 54 (App. Div. 2007) (citing McDonough v. Jorda, 214 N.J. Super. 338, 350 (App. Div. 1986) (finding no liability against public entity for assault and battery perpetrated by public employees)).

It appears that the claims for false arrest/imprisonment (Count One), malicious prosecution (Count Two), intentional infliction of emotional distress (Count Three), malicious abuse of process (Count Four), tortious interference with economic advantage (Count Five), malicious assault and battery (Count Thirteen), and assault and battery (Count Fourteen), are all based on allegations that Borrero acted criminally, maliciously, or that he committed willful misconduct. The undisputed facts currently before the Court show that Borrero acted with willful misconduct throughout the altercation with Lesende. While off-duty, Borrero followed her in his vehicle, stopped her by blocking her car's passage, screamed at and insulted her, entered her car to punch, hit and otherwise injury her, pointed his gun at her, searched her car, handcuffed her to a chair in the jail cell, and instituted a complaint against her for assault and battery and resisting arrest. Neither party has presented any argument suggesting that Borrero's actions did not constitute willful misconduct. Accordingly, summary judgment shall be granted to the City on Counts One, Two, Three, Four, Five, Thirteen, and Fourteen.

**C.      Count 6:  Negligent Hiring, Training and Supervision**

Lesende claims that the City was negligent in the manner in which it hired, supervised or retained Borrero.  Lesende further claims that as a result of the City's negligence, she was exposed to Borrero, a dangerous individual, who ultimately physically attacked her on October 18, 2004.  A claim based on negligent hiring or negligent supervision is distinct from a claim based on respondeat superior.  Hoag, 397 N.J. Super. at 54.  "[T]he tort of negligent hiring addresses the risk created by exposing members of the public to a potentially dangerous individual, while the doctrine of respondeat superior is based on the theory that the employee is the agent or is acting for the employer."  Di Cosala v. Kay, 91 N.J. 159, 172 (1982).  "Accordingly, the negligent hiring theory has been used to impose liability in cases where the employee commits an intentional tort, an action almost invariably outside the scope of employment…where the employer either knew or should have known that the employee might engage in injurious conduct towards third persons."  Id. at 173.  The TCA immunity from vicarious liability for the willful misconduct of public employees, N.J. Stat. Ann. § 59:2-10, did not alter the previously established body of law that public entities could be liable for negligent training and supervision claims.  Denis v. City of Newark, 307 N.J. Super. 304, 312-13 (App. Div. 1998) (citing McAndrew v. Mularchuk, 33 N.J. 172 (1960)); see also Pacifico v. Froggatt, 249 N.J. Super. 153, 155 (Law. Div. 1991) (dismissing negligent hiring claim only for lack of evidence, not for conflict with the TCA).

The City may be liable to Lesende if it failed to exercise due care in hiring, supervising, or retaining an unfit individual and such negligence was a proximate cause of Lesende's injuries. In New Jersey, the tort of negligent hiring/retention and supervision involves two fundamental requirements.  Adams v. City of Camden, 461 F. Supp. 2d 263, 269 (3d Cir. 2006) (citing Di

Cosala, 91 N.J. at 173-74) (applying Di Cosala in a suit against Camden for the alleged

misconduct of its police officers).  The Supreme Court of New Jersey stated that:

> The first [requirement] involves the knowledge of the employer and foreseeability
> of harm to third persons.  An employer will only be held responsible for the torts
> of its employees beyond the scope of the employment where it knew or had
> reason to know of the particular unfitness, incompetence, or dangerous attributes
> of the employee and could reasonably have foreseen that such qualities created a
> risk of harm to other persons.  The second required showing is that, through the
> negligence of the employer in hiring the employee, the latter's incompetence,
> unfitness or dangerous characteristics proximately caused the injury.

Id.  Foresight, not hindsight, is the standard by which an employer's duty of care must be judged.

Id. at 173.  The employer must be judged on what it had reason to know at the time the employee

was hired or retained.

In a case with largely analogous facts to the present matter, the Superior Court, Appellate

Division, determined that a plaintiff had established a prima facie case of liability against the

public entity defendants for negligently retaining a police officer when they knew or should have

known of his dangerous propensities and the risk of injury he presented to the public.  Denis, 307

N.J. Super. at 314.  In Denis, an off-duty officer struck the plaintiff in the head with a police

radio after he issued her a careless driving ticket.  In determining that the plaintiff had

established a prima facie case for negligent hiring, the Appellate Division relied on evidence that

the officer's personnel file contained documents concerning three incidents (two of which

occurred before relevant one) for which the officer was disciplined based on assaultive behavior

on defenseless citizens.  Additionally, the file contained documents showing that the officer had

been suspended nine times for violating police regulations between 1985 and 1995.  In sum, the

Appellate Division found that the officer's extensive disciplinary record sufficed to support a

prima facie case that the City knew or should have known of the officer's dangerous propensities.

Similarly, in the present matter, Lesende has adduced evidence of Borrero's extensive disciplinary history and submitted an expert report which offers several opinions relevant to the question of whether the City had reason to know that Borrero posed a risk of danger to members of the public.  Borrero's disciplinary record lists a total of 45 internal affairs cases resulting in the imposition of 15 penalties.  Borrero's record includes four excessive force allegations (none of which were sustained), a sustained false reporting complaint, two sustained demeanor complaints which took place at Penn Station during a 20-day period and involved motorists who questioned Borrero while being cited for parking violations, and a sustained allegation of assisting an out-of-state bounty hunter's search for a fugitive in New Jersey.  In three separate matters, three Administrative Law Judges found that Borrero was not credible or made false statements.  (Fisher Supp. Report at 4.)

Fisher, Lesende's expert, opined that the city should have taken Borrero's entire disciplinary history into account when reviewing each subsequent allegation, but failed to do so.  (Fisher Report at 20.)  Fisher believes that based on Borrero's pattern of conduct, his extensive disciplinary history, and prevailing professional standards, the City should have taken steps to terminate him prior to the October 2004 incident.  (Fisher Supp. Report at 5-6.)  Borrero's extensive disciplinary record and Fisher's opinion about the propriety of the City's retaining Borrero in its employ together create a triable issue as to whether the City was negligent in retaining Borrero.

In relation to the supervision aspect, Fisher opined that the Police Training Commission requires that an officer's employing agency be responsible for certifying his familiarity with

policies and procedures regarding standards of conduct while off duty.  (Fisher Report at 12.)
Fisher believes that the City should have had a department policy directive or general order
regarding the off-duty exercise of law enforcement authority.  (Fisher Supp. Report at 3.)
Additionally, Fisher described the state-mandated training curriculum for police officers
regarding off-duty interactions with the public.  The training curriculum teaches that when an
off-duty officer witnesses a motor vehicle violation, she should not take immediate action unless
the violation constitutes a threat to public safety.  (Fisher Report at 10.)  Fisher noted that
Borrero's off-duty actions with regard to Lesende failed to comport with police officer training
directives and generally accepted standards of practice in the police profession.  Id. at 11.

 Lesende has raised a genuine issue of fact as to whether the City was negligent in
retaining and supervising Borrero.  The Court will deny the City's motion for summary judgment
on the torts of negligent hiring, retention, and supervision.  Lesende will be allowed to present
her claims for Count Six before the jury.

**D. Count 9:  42 U.S.C. § 1983 Claim for Fourth and Fourteenth Amendment Violations Based on Training and Hiring of Borrero**

 Lesende asserts that she was subject to unlawful arrest and excessive force at Borrero's
hands because of an official custom or policy of the City, in violation of the Fourth Amendment
right of the people to be secure in their persons, houses, papers, and effects, against unreasonable
searches and seizures, made applicable to the states by the Fourteenth Amendment.  Specifically,
Lesende premises § 1983 liability against the City based on its alleged (1) failure to train Borrero
about the protocol for off-duty police interactions with citizens and (2) failure to properly review
Borrero's disciplinary record and take appropriate actions, which lead to the City's retaining him
in its employ.

A <u>prima</u> <u>facie</u> case under § 1983 requires the plaintiff to demonstrate:  (1) a person deprived him of a federal right; and (2) the person who deprived him of a federal right acted under color of state or territorial law.  In <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 690 (1978), the United States Supreme Court determined that municipalities are "among those persons to whom § 1983 applies."  However, "a municipality cannot be liable <u>solely</u> because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a <u>respondeat</u> <u>superior</u> theory."  <u>Id.</u> (emphasis in original).  Rather, the City can be held liable for any constitutional deprivations suffered by Lesende only if "there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  <u>City of Canton v. Harris</u>, 489 U.S. 378 (1989).

"[A] plaintiff seeking to impose liability on a municipality [must] identify a municipal policy or custom that caused the plaintiff's injury."  <u>Bd. of the County Comm'rs of Bryan County v. Brown</u>, 520 U.S. 397, 402 (1997) (internal quotation marks omitted).  "Locating a policy ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality."  <u>Id.</u> (citing <u>Monell</u>, 436 U.S. at 694).  "Similarly, an act performed pursuant to a custom that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law."  <u>Id.</u>  A "custom, or usage," of a state for § 1983 purposes "must have the force of law by virtue of the persistent practices of state officials."  <u>Adickes v. S. H. Kress & Co.</u>, 398 U.S. 144, 167 (1970).  Whether liability is premised on the existence of a policy or a custom, the municipality's liability can be predicated "only [upon] acts for which the municipality itself is actually responsible…."  <u>Paprotnik</u>, 485 U.S. , 123 ().  "Only

22

those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability." Id. (quoting Pembaur v. City of Cinncinnati, 475 U.S. 469, 483 (1986)).

Generally, a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with "deliberate indifference" as to its known or obvious consequences. City of Canton, 489 U.S. at 388. A showing of deliberate choice could be made where "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy was so likely to result in the violation of constitutional rights, that the policy makers of the city can reasonably be said to have been deliberately indifferent to the need." Id.

The official policy or adopted custom that subjects a municipality to § 1983 liability may relate to the training of police officers. See Bryan County v. Brown, 520 U.S. 397 (1997); Brown v. Muhlenberg Twp., 269 F.3d 205, 215 (3d Cir. 2001). In City of Canton, the Supreme Court noted that inadequate training claims are meant to give rise to liability only in "limited circumstances." Id. at 387. The plaintiff alleged that the city had failed to adequately train its police officers as to when to summon medical care for an injured detainee. Id. The Supreme Court ruled that a claim of inadequate training will trigger municipal liability only where the "failure to train amounts to deliberate indifference to the rights" of those with whom municipal employees will come into contact. Id. at 388. The Court explained that "deliberate indifference" requires that city policy makers made a "deliberate choice…from among various alternatives" not to fully train employees. Id. at 389.

23

The Court offered as an example of deliberate indifference a municipality's failure to train police officers on the proper use of deadly force.  The Court noted that "city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons."  Id. at 390 n.10.  Moreover, "the city has armed its officers with firearms, in part to accomplish this task."  Id.  In such a situation, "the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious' that failure to do so would properly be characterized as 'deliberate indifference' to constitutional rights."  Thus, the issue is not only whether a training program is inadequate; the question is whether such inadequate training can justifiably be said to represent city policy.  Id.  The Supreme Court explained that:

> That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program.  It may be, for example, that an otherwise sound program has occasionally been negligently administered.  Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.  Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal.  And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program….

Id.

To meet the high standard of "deliberate indifference," it is often persuasive for a plaintiff to show that a pattern of constitutional violations by inadequately trained employees existed.  Such a pattern would put municipal decision makers on notice that a new program is called for, and their continued adherence to an inadequate program in the face of those continued violations might constitute deliberate indifference.  Bryan County, 520 U.S. at 407. Additionally, a pattern of similar violations "may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer

involved in the particular incident, is the 'moving force' behind the plaintiff's injury." Id. at

407-08.  Conversely, "there are situations in which the risk of constitutionally cognizable harm is

so great and so obvious that the risk and the failure of [the municipality] to respond will alone

support" a finding of deliberate indifference.  Id.

"In virtually every instance where a person has had his or her constitutional rights

violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could

have done' to prevent the unfortunate incident." City of Canton, 489 U.S. at 391.  Thus, in

addition to proving deliberate indifference, a plaintiff must also demonstrate that the inadequate

training caused the constitutional violation.  Carswell v. Borough of Homestead, 381 F.3d 235,

244 (3d Cir. 2004).  "There must be a direct causal link between a municipal policy or custom

and the alleged constitutional deprivation."  Id. (quoting Brown, 269 F.3d at 244) (internal

quotation marks omitted).  In other words, "the identified deficiency in a city's training program

must be closely related to the ultimate injury." City of Canton, 489 U.S. at 391.  "To establish

the necessary causation, a plaintiff must demonstrate that a 'plausible nexus' or 'affirmative link'

between the municipality's custom and the specific deprivation of constitutional rights at issue."

Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990).  "To adopt lesser standards of fault and

causation would open municipalities to unprecedented liability under § 1983."  Id.

Although Fisher offered a compelling opinion that the City should have had a

"Department Policy Directive or General Order regarding the off-duty exercise of law

enforcement authority," the City's failure to have such a policy directive or order does not rise to

the level of the constitutional standard of deliberate indifference.  Lesende has not brought to the

Court's attention any pattern of prior incidents that should have caused defendants to believe that

Newark police officers had received inadequate training regarding the scope of an officer's

expected comportment when she views a traffic violation while off duty.  Further, the risk that an off duty officer will beat a woman based on a traffic violation is not an obvious risk flowing from a failure to train officers in proper off duty behavior.  See Bryan County, 520 U.S. at 409 ("'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.").  Rather, Borrero's behavior appears to have been so far beyond the pale that the risk that he or any other officer would beat a woman for a perceived traffic violation while off duty was anything but obvious.  In short, Lesende has pointed to no deliberate or conscious choice by a policy-making official that could constitute deliberate indifference.

Furthermore, the question of causation also requires the Court to grant summary judgment in favor of the City on the § 1983 failure to train claim.  Better training in off-duty interactions is exactly the "something the city 'could have done' to prevent the unfortunate incident" that the Supreme Court in City of Canton warned was insufficient to meet the causation standard.  See City of Canton, 489 U.S. at 391.  No reasonable jury would believe that while Borrero took the actions he took—stopping a driver by blocking her passage while off-duty, screaming at her, and beating her in her car—he was thinking of his police training.  Thus, based on the nature of Borrero's apparently willful conduct, it appears clear at this juncture that factors peculiar to the errant officer involved in the particular incident, rather than a City-wide lack of proper training, was the 'moving force' behind the plaintiff's injury.  See Bryan County, 520 U.S. at 407-08.  Lesende's § 1983 claim against the City for failure to train Borrero in proper off-duty comportment is dismissed.

The Court will now turn to Lesende's second argument for imposing liability against the City under § 1983; that the City failed to properly review Borrero's disciplinary record and take appropriate actions, which lead to the City's retaining him in its employ.

Although the present matter purports to present a claim for the retention, rather than the hiring of an officer, the decision to hire or retain an employee is in many ways analogous, since both claims are based on an allegedly flawed review of a person's record.  The deliberate indifference standard applies to both training and hiring cases, but the application of the standard to a hiring claim differs slightly, since the danger that municipal liability for a hiring decision will collapse into respondeat superior is much higher, because in the broadest sense, every injury is traceable to a hiring decision.  See Id. at 415.

For a hiring claim, "[a] plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." Id. at 411.  "[A] finding of culpability cannot simply depend on the mere probability that any officer inadequately screened will inflict any constitutional injury." Id. "Unlike the risk from a particular glaring omission in a training regimen, the risk from a single instance of inadequate screening of an applicant's background is not 'obvious' in the abstract." Id. at 410.  Rather, culpability must depend on a finding that the officer was highly likely to inflict the particular injury at issue; that is, "[t]he connection between the background of the [employee] and the specific constitutional violation alleged must be strong." Id. at 411.

In Bryan County, the Supreme Court determined that the plaintiff failed to show that the County's inadequate screening of a police officer demonstrated a conscious disregard for a high risk that the officer would use excessive force in violation of the plaintiff's right to be free from a use of excessive force. Id. at 414-15.  The Court examined whether a full review of the officer's

record should have led the hiring official to the conclusion that the officer's use of excessive

force would be a plainly obvious consequence of the hiring decision.  Id. at 412.  The officer's

record revealed various misdemeanor infractions, including a fight on a college campus when he

was a student, for which he was charged with assault and battery, resisting arrest, and public

drunkenness; nine moving violations, a charge of driving with a suspended license, and driving

while intoxicated.  Id. at 413-14.

　　　In the present matter, although it is unfortunate that the City did not take precautions,

such as ordering an evaluation earlier, or in the alternative, assigning Borrero to administrative

duty while the psychological evaluation was pending, it does not appear that the City exhibited

the deliberate indifference sufficient to meet the § 1983 standard for municipal liabiltiy.  A

review of Borrero's disciplinary record before the October 18, 2004 incident occurred would not

have led a reviewing officer to the conclusion that Borrero's use of excessive force would be a

plainly obvious consequence of retaining him in the City's employ as a police officer as of

October 18, 2004.  Cuccolo and Fisher both described Borrero's disciplinary record as extensive;

it includes a sustained false reporting claim, two sustained demeanor claims, a sustained

complaint of assisting a bounty hunter, and three determinations by Administrative Law Judges

that Borrero was not credible.  Borrero's record does contain four excessive force allegations, but

none of those complaints was sustained.  Borrero's record may have made him appear to be a

very poor police officer, but it was insufficient to bring the City to the necessary conclusion,

under the deliberate indifference standard, that the plainly obvious consequence of retaining

Borrero as a police officer in October 2004 was that he would use excessive force.  Therefore,

the City's failure to terminate or assign him to administrative duty before the incident does not

rise to the stringent level required for municipal liability.

Lesende's claim for municipal liability must also fail because she failed to make a showing that the City's retention of Borrero at the time of the incident constituted deliberate indifference attributable to the City.  Lesende has not adduced evidence that the City's failure to take the employee's entire record into account when performing internal affairs investigations was a custom.  A custom, for § 1983 purposes, "must have the force of law by virtue of the persistent practices of state officials."  Adickes v. S. H. Kress & Co., 398 U.S. 144, 167 (1970). The evidence Lesende presented suggests that the various internal affairs investigations of complaints against Borrero were inconsistent in regard to whether they took into consideration the subject officer's entire disciplinary record.  (Fisher Report at 20.)  That is, some reports did take Borrero's disciplinary history into account when disposing of the individual complaint, while others did not.  This inconsistent practice is hardly sufficient to qualify as a municipal custom.  It appears that the individual reviews of complaints against Borrero were sometimes less complete than they could have been; however, these omissions are a series of isolated incidents, rather than a persistent municipal custom.  This showing falls far short of the standard required for municipal liability under § 1983.  Since Lesende has failed to point to any municipal policy or custom that caused the City to retain Borrero in its employ, this portion of Lesende's § 1983 claim against the City must also fail.

In conclusion, the Court will grant summary judgment to the City on the municipal liability claims premised on training and hiring.  The Court will dismiss Count Nine of the Complaint against the City.

**E.**   **Count 12:  42 U.S.C. § 1983 Claim for Fourth and Fourteen Amendment Violations Based on the Rules Governing the Courts of the State of New Jersey, 3:3-1(c) and 3:4-1(a)**

Count Twelve alleges liability based on the Rules Governing the Courts of the State of New Jersey ("RCG"), §§ 3:3-1(c) and 3:4-1(a).  RGC § 3:3-1(c) is titled "Determination of Whether to Issue a Summons or Warrant."  It states that:

A summons rather than an arrest warrant shall be issued unless:

(1)      the defendant is charged with murder, kidnapping, aggravated manslaughter, manslaughter, robbery, aggravated sexual assault, sexual assault, aggravated criminal sexual contact, criminal sexual contact, second degree aggravated assault, aggravated arson, arson, burglary, violations of Chapter 35 of Title 2C that constitute first or second degree crimes, any crime involving the possession or use of a firearm, or conspiracies or attempts to commit such crimes;

(2)      the defendant has been served with a summons and has failed to appear;

(3)      there is reason to believe that the defendant is dangerous to self, other persons, or property;

(4)      there is an outstanding warrant for the defendant;

(5)      the defendant's identity or address is not known and a warrant is necessary to subject the defendant to the jurisdiction of the court; or

(6)      there is reason to believe that the defendant will not appear in response to a summons.

RGC § 3:4-1(a) is titled "Arrest Without Warrant," and states that:

(1)      Preparation of Complaint. A law enforcement officer shall take a person who was arrested without a warrant to a police station where a complaint shall be prepared immediately. If it appears that issuance of a warrant is authorized by Rule 3:3-1(c) or the prosecution of the person would be jeopardized by immediate release, the complaint may be prepared on a Complaint-Warrant (CDR2) form. Otherwise, the complaint shall be prepared on a Complaint-Summons (CDR1) form.

(2)      Issuance of Process. If a Complaint-Summons (CDR1) has been prepared, the law enforcement officer may serve the summons and release the defendant. If a Complaint-Warrant (CDR2) has been prepared, without unnecessary delay, and

no later than 12 hours after arrest, the matter shall be presented to a judge, or, in the absence of a judge, to a judicial officer who has the authority to set bail for the offense charged. The judicial officer shall determine whether to issue a warrant or summons as provided in Rule 3:3-1, and if a warrant is issued, shall set bail immediately.

Lesende claims that the issuance of a complaint warrant against her was improper in light of the RGC rules, and this impropriety should support a § 1983 claim against the City. However, alleged violations of state law are insufficient to state a claim under § 1983. <u>Kulwicki v. Dawson</u>, 969 F.2d 1454, 1468 (3d Cir. 1992). This claim will be dismissed.

**F.      Count 7 and Count 10:  Civil Conspiracy**

The Complaint alleges "civil conspiracy to commit the tort(s) and/or civil rights violations alleged in this Complaint" as Count Seven, and 42 U.S.C. § 1985 conspiracy to "deprive, directly or indirectly, the plaintiff of her equal protection of the laws, and/or equal privileges and immunities under the laws" as Count Ten. In Lesende's brief, however, she only addressed § 1985. Therefore, the Court will consider Lesende to have dropped Count Seven, the indecipherable claim of a civil conspiracy to commit tort(s) and/or civil rights violations, which cited no state or federal law.

The Court will now turn to the claim for § 1985 conspiracy. In Lesende's brief, she only argued in relation to § 1985(3), so the Court will similarly restrict its analysis to that section of the statute. To state a claim under § 1985(3), a plaintiff must show:  (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States. <u>Farber v. City of Paterson</u>,

440 F.3d 131, 135 (3d Cir. 2006).  A § 1985(3) claim must be based on "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action" in order to state a claim.  Id. (quoting Griffin v. Breckenridge, 403 U.S. 88 (1971)).  Since the City is the only defendant relevant to the present motion, this claim against it must be dismissed.  A municipality acting in its governmental capacity cannot be a conspirator, so municipalities are excluded from liability under § 1985.  See, e.g., Milburn v. Girard, 429 F. Supp. 865, 868 (E.D. Pa. 1977) (citing Bosely v. City of Euclid, 496 F.2d 193, 195 (6th Cir. 1974); Agnew v. City of Compton, 239 F.2d 226, 233 (9th Cir. 1956), cert. denied, 353 U.S. 959, 1 L. Ed. 2d 910, 77 S. Ct. 868 (1957); Ransom v. City of Philadelphia, 311 F. Supp. 973, 974 (E.D. Pa. 1970); Veres v. County of Monroe, 364 F. Supp. 1327, 1328-31 (E.D. Mich. 1973)).  Summary judgment is granted for the City on Counts Seven and Ten.

## G.    Count 8:  New Jersey Civil Rights Act

Lesende's Complaint states that "Newark…interfered with and/or attempted to interfere with by threats, intimidation, and/or coercion with [sic.] the exercise and/or enjoyment of the plaintiff of her substantive due process, equal protection rights, privileges and/or immunities secured by the constitution of the United States and/or State of New Jersey, in violation of N.J. Stat. Ann. 10:6-2."  The Court has already determined that the City is not liable for any violation of Lesende's federal constitutional rights.  As for the claim under the New Jersey Constitution, Lesende does not cite any specific paragraph of that document in the Complaint, opposition papers, or sur-reply.  The Court is unable to divine the nature of plaintiff's claims against the City under the New Jersey Constitution, so this claim will be dismissed.

**H.      Count 11:  Use of Excessive Force Pursuant to N.J. Stat. Ann. § 2C:3-7**

Count Eleven purports to state a civil claim against the City for damages under N.J. Stat.

Ann. § 2C:3-7.  Section 2C:3-7 is a provision in the New Jersey Code of Criminal Justice that

describes the limits on the use of force in law enforcement and deals with principles of

justification.  The statute expressly provides that it governs only the affirmative defense of

justification to criminal prosecution.  N.J. Stat. Ann. § 2C:3-1.  The statute is inapposite because

it does not create any civil right of action, so Lesende's claim under it must fail.  Summary

judgment for the City is granted on Count Eleven.

**I.      Count 15:  Loss of Consortium**

Victor Lesende, Lesende's husband, made a claim for loss of consortium.  He claims to

have "suffered and shall continue to suffer the loss of companionship, consortium and services

during the period of Plaintiff Sara Lesende's disability."  Since Lesende's only claim that

remains against the City is Count Six for negligent training and supervision, that is the only

claim for which the loss of consortium claim remains, as against the City.

A loss of consortium claim is intended to compensate a person for the loss of a spouse's

"society, companionship and services due to the fault of another."  Kibble v. Weeks Dredging &

Const. Co., 161 N.J. 178, 190-91, (1999) (quoting Wolfe v. State Farm Ins. Co., 224 N.J. Super.

348, 350 (App. Div.), cert. denied, 111 N.J. 654 (1988)).  Although such a claim is derivative of

the injured spouse's injury cause of action, it is also independent, as damages which may be

awarded to the spouse pursuant to the claim are clearly different from the damages which may be

awarded to the spouse suffering the direct injury.  Id. (citing Tichenor v. Santillo, 218 N.J. Super.

165, 173 (App. Div.1987); Hauck v. Danclar, 262 N.J. Super. 225, 227 (Law Div.1993)).  Victor

Lesende's loss of consortium claim against the City will survive summary judgment, pending the

33

determination of Lesende's only remaining claim against the city, Count Six for negligent hiring and supervision under state law.

## III.  CONCLUSION

For the foregoing reasons, the City's motion is granted in part and denied in part. Summary judgment is granted for Counts One, Two, Three, Four, Thirteen and Fourteen, because the TCA limits a public entity's liability for acts of employees constituting willful misconduct; granted for Count Nine because even taking the facts in the light most favorable to Lesende, the City is not liable under the stringent standard required for municipal liability under § 1983; granted for Count Twelve because that claim is premised on an alleged violation of state law and violations of state law do not suffice to state a claim under § 1983; granted for Counts Seven and Ten because a municipality cannot be a conspirator; granted for Count Eight because the claim was unsupported by any arguments; granted for Count Eleven because the statute alleged to be violated does not create any private right of action; and denied for Count Six because Lesende has raised a question of fact as to whether the City was negligent in its retention and supervision of Borrero and denied for Count Fifteen, because it is a claim that derives from Count Six.  The court will enter an order implementing this opinion.  Summary judgment is also granted to the City on the TCA issue of pain and suffering damages.  This case remains open as to Counts Six and Fifteen, and as to all claims against Borrero.


_____ _s/ Dickinson R. Debevoise_____

DICKINSON R. DEBEVOISE, U.S.S.D.J.


Dated: March 8, 2010

34